J-A08040-25
J-A08042-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| N.E.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| J.Z.M. | : | |
| | : | |
| | : | No. 1886 EDA 2024 |
| APPEAL OF: RICHARD DUCOTE | : | |

Appeal from the Order Entered June 13, 2024
In the Court of Common Pleas of Montgomery County Civil Division at
No(s):  2017-28078

| | | |
|---|---|---|
| N.E.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.Z.M. | : | No. 2078 EDA 2024 |

Appeal from the Order Entered June 13, 2024
In the Court of Common Pleas of Montgomery County Civil Division at
No(s):  2017-28078

BEFORE:  LAZARUS, P.J., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:          **FILED JANUARY 5, 2026**

N.E.G. ("Mother") and her present counsel, Richard Ducote ("Attorney Ducote"), *pro se*, appeal[1] from the order finding them in civil contempt and directing them to pay counsel fees incurred by J.Z.M. ("Father") during an

---

[1] We have consolidated these appeals for the purpose of decision because of the substantial similarities in the underlying facts and issues raised.

ongoing child custody matter involving their three children, twin daughters,

I.M. and J.M.M., and a son, J.M. (collectively, "Children").[2]   The trial court

specifically held Mother in contempt in eight areas and ordered her to pay

Father's counsel's fees from May 2023 to February 2024.[3]   Additionally, the

_____

[2] The trial court entered the present order as part of continuing contempt proceedings, which commenced in August 2023 and ended in March 2024. This Court previously addressed prior contempt orders from these proceedings in **N.E.G. v. J.Z.M**, 341 A.3d 72, 2025 WL 1879568 (Pa. Super. 2025) (non-precedential *per curiam* mem. decision) ("**N.E.G. I**"), including a January 11, 2024 order finding Attorney Ducote and Mother's prior counsel, Joseph Rizzo ("Attorney Rizzo"), in contempt and imposing sanctions based on Father's counsel's fees through September 2023.  Attorney Rizzo represented Mother before Attorney Ducote's entry of appearance, and both Attorney Rizzo and Attorney Ducote represented Mother until Attorney Rizzo withdrew from the custody proceedings in September 2023.  However, Attorney Rizzo currently represents Mother in this appeal, although he is not a party to this appeal himself.  **See** Order, 2078 EDA 2024, 10/18/24.

Mother and Attorney Ducote have pending petitions for allowance of appeal from **N.E.G. I** at 407, 580, and 581 MAL 2025.

We note that the parties' daughters have turned eighteen during the pendency of the custody proceedings and this appeal.  **See M.B.S. v. W.E.**, 232 A.3d 922, 927 (Pa. Super. 2020) (concluding issues concerning a child who turned eighteen during the pendency of appeal are moot).  The parties' son, J.M., however, remains subject to the ongoing custody proceedings.

[3] The trial court specifically found Mother in contempt in the following areas: (1) refusing to comply with mental health evaluations; (2) refusing to comply with court orders concerning photographs; (3) communicating with Children about custody matters; (4) violations of a gag order; (5) interfering with J.M's counseling; (6) failing to keep Father apprised of Children's  activities and appointment; (7) improperly filing matters on the trial court's docket; and (8) filing frivolous appeals.  **See** Trial Ct. Mem., Seq. No. 1026, 6/13/24, at 16-29.  Although not listed as specific conduct constituting contempt, it is clear that the trial court also determined Mother was in contempt for interfering
*(Footnote Continued Next Page)*

instant order found Attorney Ducote in contempt and ordered him to pay counsel fees from September 2023 to February 2024.[4]  We affirm in part, vacate in part, and remand for further proceedings consistent with this decision.

We summarize the background to these appeals as follows.  Mother and Father were married in 2006.  In 2017, Mother filed a complaint for divorce raising custody matters concerning Children, who, at that time were ten- and six-years-old, respectively.  A divorce decree issued in 2019.  In May 2019, a court entered an agreed order for shared physical and legal custody of Children.

Throughout the underlying custody proceedings, Mother serially filed for protection from abuse ("PFA") orders alleging Father physically abused her and endangered Children.  **See generally Gross v. Mintz**, 284 A.3d 479 (Pa. Super. 2022).[5]  The record in the custody proceeding contained only occasional reference to Mother's concern over Father taking inappropriate photographs of Children ("the photographs") before 2022.  However, by 2023,

_____

with Father's rights under then-existing custody orders.  **See id**. at 35-36 (rejecting Mother's defenses to Father's claim she violated shared custody provision).

[4] The trial court intermingled references to Attorney Ducote and Attorney Rizzo in its discussions of the eight areas of contempt listed above.  **See** Trial Ct. Mem., Seq. No. 1026, 6/13/24, at 16-29.

[5] The Honorable Kelly Wall ("Judge Wall") began presiding in the custody proceedings in March 2021; Judge Wall recused in September 2024.  **See N.E.G. I**, 2025 WL 1304763, at *1 n.1.

the photographs, as well as Mother's allegations that Father's possession of the photographs constituted sexual abuse or exploitation of Children, became the centerpiece of her repeated filings in the custody proceedings, related PFA proceedings, and reports to child welfare offices and law enforcement agencies.[6] ***See generally Gross o/b/o I.M. v. Mintz***, 321 A.3d 1005 (Pa. Super. 2024), *appeal denied*, --- A.3d ---, 2025 WL 2699879 (Pa. Sept. 23, 2025); Emergency Pet., Seq. No. 429, 5/17/23.[7]   Father, in turn, filed

_____

[6] There is no indication that any child welfare office determined that the allegations of sexual abuse or exploitation were founded or that law enforcement filed charges against Father.  ***See*** Trial Ct. Mem., Seq. No. 1026, 6/13/24, at 13-15 (noting the more than thirty-six reports to the child welfare offices in Pennsylvania and New York, nine child welfare investigations, several interviews of Children, as well as reports to law enforcement agencies, including the local and New York police, and the Federal Bureau of Investigation).  We note that the child welfare referrals discussed at the contempt hearings came from mandated reporters, not Mother directly.

[7] I.M. apparently took a non-fatal overdose of Tylenol in January 2023, while at Mother's home, approximately one week after returning from vacation with Father, and a few days after a weekend visit with Father.  ***See*** N.T., Seq. No. 1004, 2/16/24, at 73; N.T., Seq. No. 1015, 1/9/24 at 179; ***see also*** N.T., Seq. No. 1017, 5/6/24, at 86-102.  We note the May 6, 2024 transcript involved a subsequent custody hearing that was part of the record transmitted to this Court in these appeals.  We take notice of that transcript for the purpose of background information only.

It appears Mother only informed Father of the overdose in a PFA petition she filed against him and alleged that I.M. attempted to commit suicide because of Father.  ***See*** N.T., Seq. No. 1004, 2/16/24, at 73-77, 273-74; N.T., Seq. No. 1015, at 193.  The trial court did not render any findings about whether I.M. attempted to commit suicide, or Mother's allegations about the cause of the incident, because I.M. refused to disclose any medical records related to the incident to Father or the court.  ***See*** Trial Ct. Mem., Seq. No. 1026, 6/13/24, at 8 & n.8.

numerous petitions for emergency relief and contempt claiming that Mother, *inter alia*, misused the photographs and PFA proceedings to interfere with his custodial rights. ***See generally*** Emergency Pet., Seq. No. 450, 6/5/23.

In March 2023, the trial court ordered mental health evaluations of Mother and Father. ***See*** Order, Seq. No. 364, 3/3/23.[8] By May 2023, Mother began filing motions seeking the trial court's recusal, as well as interlocutory appeals to this Court. Mother, and Attorney Rizzo, also began filing "notices" on the trial court's docket, which prompted Father to file petitions to strike. Attorney Ducote entered his appearance for Mother in May 2023; his appearance coincided with an immediate escalation of the inflammatory tone of Mother's sexual abuse allegations against Father. ***See*** Emergency Pet., Seq. No. 432, 5/17/23. The May 17, 2023, emergency petition referred to, and attempted to attach, "sworn statements" of I.M. and J.M.M. ***See id***. Those "sworn statements" referred to I.M.'s and J.M.M.'s statements taken by Attorney Ducote before a court reporter, while at the home of Children's maternal grandmother, all without leave of court or notice to Father's counsel. ***See*** Emergency Pet., Seq. No. 432; Order, Seq. No. 533, 7/21/23; N.T., Seq. No. 547, 7/17/23, at 146.

In addition to attaching documents like the "sworn statements" to their filings, Mother and her counsel also attempted to file documents directly onto the docket under headings of "notices," "submissions," or "responses,"

_____

[8] Mother did not undergo a mental health evaluation.

- 5 -

without first submitting them to the trial court. The trial court struck such "notices" from the docket, and, in June 2023, cautioned Mother and her counsel that continued attempts to incorporate matters in a form not permitted by the Rules of Civil Procedure would result in sanctions. *See* Order, Seq. No. 457, 6/8/23.

On June 26, 2023, the trial court granted Mother's motion to review *in camera* the photographs which Mother and Attorney Rizzo asserted constituted child sex abuse images. *See* Mot., Seq. No. 416, 5/5/23; Order, Seq. No. 476, 6/26/23 ("June 26, 2023 order"). However, the court's order attached several conditions that, in relevant part, required Mother and her counsel to certify whether the photographs had been used in prior PFA proceedings or had been shown to, and reviewed by, law enforcement or child welfare agencies. *See* Order, Seq. No. 476, 6/26/23; *see also* Trial Ct. Mem., Seq. No. 1026, 6/13/24, at 19 (explaining that the trial court imposed the conditions to assure the photographs were newly discovered matters).

The trial court scheduled a hearing for July 17, 2023, to address Mother's and Father's emergency custody petitions, as well as other pretrial matters. *See* Order, Seq. No. 474, 6/21/23 ("June 2023 scheduling order"). The June 2023 scheduling order contained a provision prohibiting Mother and Father, and their counsel, from communicating with Children about the custody litigation. *See id*. Mother's counsel sought to continue or stay the

July 17, 2023 hearing, but the trial court denied the motions for continuance, and Mother's counsel filed numerous appeals.

Neither Attorney Ducote nor Attorney Rizzo appeared at the July 17, 2023 hearing, but Mother appeared on her own behalf. At that hearing, Mother repeatedly referred to the photographs over the trial court's warnings that it would not consider the photographs because she and her counsel failed to comply with the conditions in June 26, 2023 order. Mother persisted, and the trial court found her in contempt and assessed a $5,000 fine from the bench. ***See*** N.T., Seq. No. 547, 7/17/23, at 245 ("the July 17, 2023 contempt"). However, the trial court subsequently reserved a final decision on whether to impose sanctions and entered an interim custody order. ***See*** Order, Seq. No. 533, 7/21/23.

On July 19, 2023, Attorney Ducote filed a civil lawsuit in Montgomery County for Mother on behalf of I.M. ("the Montgomery County civil suit"); Father moved to disqualify Attorney Ducote and for sanctions. ***See*** Mot., Seq. No. 547, 7/31/23; Pet., Seq. No. 800, 12/19/23.[9]

_____

[9] Attorney Ducote answered the motion to disqualify and proclaimed, in relevant part:

> [the action,] brought to compensate I.M. for all of [Father's] intentional infliction of emotional distress, sexual abuse, and invasion of privacy, will finally bring justice for I.M., and the jury hearing the evidence and viewing the sexually exploitive photographs [Father] has been perversely taking over the years

*(Footnote Continued Next Page)*

In August 2023, the trial court determined that Mother failed to comply with its June 26, 2023 order for an *in camera* review of the photographs.[10] The trial court thus entered an order precluding Mother from submitting the photographs "to this Court in this custody matter or in any other proceedings that may be filed by Mother, individually or on behalf of any of the parties' minor children, in the Montgomery County Court of Common Pleas subsequent to this Order." Order, Seq. No. 552, 8/14/23.

As summarized in the prior appeal in **N.E.G. I**, the trial court issued a rule to show cause why Mother and her counsel should not be held in contempt and held an initial hearing on September 8, 2023. At the beginning of the hearing, the trial court outlined six areas of contempt on which it intended to proceed. **See N.E.G. I**, 2025 WL 1879568, at *2. The trial court held additional contempt hearings on November 27 and November 28, 2024, after which the trial court issued a "gag order" prohibiting Mother and her counsel from speaking publicly about the case, encouraging third-parties to speak about the case, and to remove information about the case which Mother or her counsel already posted. **See** Order, Seq. No. 740, 11/29/23 ("the

_____

will certainly award I.M. a huge nondischargeable monetary judgment for compensatory and punitive damages.

**See** Answer, Seq. No. 681, 11/13/23.

[10] As discussed below, the trial court refused to accept a wholly inappropriate attempt by Mother to verify the photographs as required by June 26, 2023 order.

November 2023 gag order").[11]  On December 1, 2023, the trial court found Mother and Attorney Ducote in contempt of the November 2023 gag order. **See** Order, Seq. No. 756, 12/1/23.

Additional contempt hearings occurred on January 9 and January 10, 2024, after which the trial court issued the January 11, 2024 order that found Attorneys Ducote and Rizzo in contempt for: (1) failing to appear at the July 17, 2023 hearing; (2) orchestrating Mother's disobedience to the court's order for a mental health evaluation; (3) willfully and intentionally refusing to direct Mother to cease attempting to introduce various photographs of the parties' children into the record without complying with prior orders concerning the photographs; (4) communicating with Children in violation of the trial court's June 2023 scheduling order; (5) refusing to obey the court's order to cease improper filings on the trial court's docket; and (6) filing dilatory, obdurate, vexatious, and frivolous appeals.  **See** Order & Mem., Seq. No. 844, 1/11/24 ("the January 11, 2024 order").

While the appeals in **N.E.G. I** were pending, the trial court held additional contempt hearings on February 16, 2024, February 28, 2024, February 29, 2024, March 6, 2024, and March 8, 2024.  The trial court also attempted to hold a multi-day custody trial in May 2024, but it stopped that

---

[11] Father's emergency petition raised at the November 27, 2023 hearing, and filed later that day, concerned a particularly troubling incident, in which Father, who was with J.M., returned to his apartment to find I.M. hiding in a closet holding a knife.

trial shortly after finding Attorney Ducote in direct criminal contempt and ordering his detention for over one hour.[12]

On June 13, 2024, the trial court entered the instant order finding Mother and her counsel in contempt and directing, *inter alia*, Attorney Ducote to pay Father's counsel $25,000 and Mother to pay Father's counsel $100,000. In its accompanying memorandum, the court outlined the "history of Mother's contemptuous conduct" and eight areas of "specific conduct by Mother and/or her counsel constituting contempt." Trial Ct. Mem., Seq. No. 1026, 6/13/24, 5, 16-29 (some capitalization omitted). The trial court reasoned:

> Mother has repeatedly and routinely defied the orders of this court and exploited [Children] as pawns in this revolting "game" that she is playing including, but not limited to, her disregard for the truth as to Father's alleged abuse of [C]hildren, her complicity with allowing the girls to attend a rally as potential speakers pertaining to the abuse they have allegedly suffered[,] and permitting her counsel to post a written letter from her minor daughter outlining her alleged abuse. Mother's unrelenting pursuit of fictitious abuse is severely compromising [C]hildren's health and well-being. Her willful and deliberate actions . . . are egregious.
>
> Mother's continued attempts to "weaponize" the use of her repeated baseless PFA filings against Father and her manipulation of third parties at her behest to file an "astronomical" amount of baseless Childline referrals is an abuse of the legal system, child protective services and law enforcement. At some point Mother must be made to stop. . . .
>
> Unfortunately, Mother has chosen counsel who is willing to "fight her cause" without limits or reason. In fact, Attorney Ducote appears to be one of the forces encouraging Mother to continue

_____

[12] We address Attorney Ducote's appeal from the May 2024 order holding him in contempt, and directing his detention in a holding cell, at J-A08041-25.

with her contemptuous course of conduct and to violate court orders that he tells her[,] in the courtroom before the undersigned[,] are unauthorized and unlawful. . . .

Trial Ct. Mem., Seq. No. 1026, 6/13/24, at 32. The court computed its sanctions against Mother based on Father's counsel's fees from May 2023 to March 2024, and against Attorney Ducote based on Father's counsel's fees from September 2023 to March 2024. Additionally, referring to Mother's July 17, 2023 contempt, when the trial court sanctioned Mother directly to pay a fine for attempting to introduce the photographs at a hearing, the trial court directed Mother to make an additional $10,000 payment to Father's counsel.

Attorney Ducote and Mother timely appealed and complied with the trial court's orders for Pa.R.A.P. 1925(b) statements. The trial court filed Rule 1925(a) statements relying on its June 13, 2024 memorandum.

In the appeal at 1886 EDA 2024, Attorney Ducote raises the following issues for appeal, namely, whether the trial court erred:

A. By Judge Wall's failing to recuse herself prior to any such contempt hearings or orders based on the numerous valid recusal motions previously filed?

B. By entering the same January 11, 2024[ c]ontempt findings, which are the subject of [**N.E.G. I**], when the trial court lack[ed] jurisdiction under Pa.R.A.P. 1701 to consider any such contempt issues, and when the trial court was precluded from proceeding further?

C. By entering these findings of contempt and the accompanying $25,000 sanctions for the same allegations the court had already adjudicated and sanctioned counsel in the January 11, 2024[ o]rder which is currently on appeal, thus violating the constitutional prohibition against double jeopardy?

- 11 -

D. By finding counsel in criminal contempt of court where there was no evidence of such contempt beyond a reasonable doubt?

E. By entering the findings and order solely as the product of Judge Wall's unabashed and open hostility, disdain, and prejudice against [Mother] and her counsel, and not from any proper application of the law or reasonable consideration of the evidence?

F. By ordering the criminal contempt of court sanctions to be paid to [Father]'s counsel without legal authority?

Attorney Ducote's Br. at 7-9 (reordered).

In the appeal at 2078 EDA 2024, Mother raises the following issues for review:

1. [J]udge . . . Wall legally erred and abused her discretion in denying the motions to recuse her filed and orally presented [sic] prior to the issuance of the June 13, 2024[] appealed order finding [Mother] in indirect criminal contempt of court and ordering her to pay $110,000 in sanctions.

2. [Judge Wall] committed an error of law and abused her discretion by repeatedly exceeding her judicial authority when[,] presiding in all/any civil contempt proceedings of the parties, Judge Wall as a punishment to [Mother] ordered more than once between July 21, 2023- June 18, 2024 a transfer of sole legal and sole physical custody to [Father], thereby modifying the final custody order of May 17, 2019 without Judge Wall ever holding a full custody hearing on the custody matter as required and in violation of ***Langendorfer v. Spearman***, [797 A.2d 303 (Pa. Super. 2002)].

3. By entering in the June 13, 2024, appealed *Order* the same December 1, 2023, and January 11, 2024, contempt findings, which are the subject of [Mother's and Attorney Ducote's appeals in **N.E.G. I**], the trial court lacks jurisdiction under Pa. R.A.P. 1701 to consider any such contempt issues, and the trial court was precluded from proceeding further.

4. The trial court legally erred and abused her discretion in finding [Mother] in indirect criminal contempt of court, where there is

- 12 -

nothing in the record to remotely establish any basis for such an adjudication beyond a reasonable doubt.

Mother's Am. Br. at 6 (reordered).

## I. Preliminary Matters

### A. Scope of Appeal

Before addressing these appeals, we initially consider whether all issues are properly before this Court. Whether an issue is appealable goes to this Court's jurisdiction and is a question of law over which our standard of review is *de novo* and plenary. *See Trust of John S. Middleton*, 313 A.3d 1079, 1085 (Pa. Super. 2024).

### *1. Denial of Recusal*

Attorney Ducote and Mother both assert that the trial court erred when denying Mother's motions to recuse. *See* Attorney Ducote's Br. at 13-17; Mother's Am. Br. at 13-16. As this Court explained in *N.E.G. I*:

> Generally, an order ruling on a motion for recusal is an interlocutory order. This Court has indicated that an appeal from a denial of a pre-trial motion to recuse . . . is not an interlocutory or collateral order that is immediately appealable. Only when the underlying action has been decided, does the court's decision become a final appealable order.
>
> . . . [T]he underlying custody matter is ongoing, and no final order has been entered concerning custody. Thus, any appeal challenging the denial of recusal is interlocutory at this juncture. Furthermore, neither Attorney Ducote nor Mother have set forth any other basis to establish this Court's jurisdiction (*i.e.*, such as pursuant to the collateral order doctrine) to invoke our jurisdiction over this issue. Therefore, we quash the portion of [those] appeals that purport[s] to appeal from the denial of the[] recusal requests.

- 13 -

***N.E.G. I***, 2025 WL 1879568 at \*11 (internal citations, quotation marks, brackets, and footnote omitted).

The reasoning and conclusion in our prior decision is both sound and persuasive. The trial court's denials of prior motions to recuse are not properly before this Court until the trial court renders a final decision on the ongoing custody matter. Accordingly, we will not consider Attorney Ducote's and Mother's claims regarding the trial court's denial of the motions to recuse.

### 2. Interim Custody Orders

Mother also asserts that the trial court erred in issuing interim custody orders in July, September, and November 2023, which must be now vacated. ***See*** Mother's Am. Br. at 39. Although the instant June 13, 2024 order sanctioning Mother and her counsel for contempt is a final order, ***see Rhoades v. Pryce***, 874 A.2d 148, 151 (Pa. Super. 2005), the order did not change custody or resolve otherwise interlocutory issues in the underlying custody matter. ***See G.B. v. M.M.B.***, 670 A.2d 714, 719-20 (Pa. Super. 1996). Therefore, we discern no basis to shoehorn Mother's challenges to prior interim custody orders into her present appeal from the order finding her in contempt. ***See id***.[13] Accordingly, we will not review the prior interim custody orders as part of Mother's present appeal.

_____

[13] Mother, in any event, would have waived the issue regarding prior interim custody orders by failing to develop meaningful appellate argument. ***See*** Mother's Am. Br. at 39. To the extent Mother refers to "Kayden's Law," we note this proceeding involves contempt, not an underlying custody

*(Footnote Continued Next Page)*

B. Jurisdiction and "Double Jeopardy"

Attorney Ducote and Mother contend that the trial court improperly continued to hear contempt issues after they appealed the December 1, 2023 order (for violations of the gag order) and January 11, 2024 order (for violations of pretrial orders) in **N.E.G. I**. They assert the instant June 13, 2024 order found them in contempt on the same bases as those prior orders. **See** Attorney Ducote's Br. at 27-29; Mother's Am. Br. at 37. Therefore, they contend the trial court lacked jurisdiction to proceed under Pa.R.A.P. 1701, and Attorney Ducote adds an assertion the trial court violated prohibitions against double jeopardy. **See** Attorney Ducote's Br. at 27-29; Mother's Am. Br. at 37.

Although the filing of an appeal generally divests the trial court of jurisdiction from proceeding in a matter, **see** Pa.R.A.P. 1701(a),[14] the trial court retains the power to "[e]nforce any order entered in the matter, unless the effect of the order has been superseded as prescribed in [Chapter 17 of

---

determination. Moreover, "Kayden's Law" became effective after the entry of the June 13, 2024 contempt order, and this Court has reasoned that the amendments do not apply retroactively. **See Jacobs v. Loughery**, 334 A.3d 392, 2025 WL 274991, at *6 n.4 (Pa. Super. 2025) (refusing to apply the Act of April 15, 2024, P.L., 24, No. 8 to a custody order entered before the Act's effective date of August 13, 2024). Therefore, Mother's passing references to "Kayden's Law" merit no further discussion.

[14] Because Rule 1701 goes to the trial court's jurisdiction to act, our review is *de novo* and plenary. **See Cassani v. Kamiak**, 307 A.3d 656, 2023 WL 6629715, at *4-5 (Pa. Super.) (non-precedential mem. decision); **see also** Pa.R.A.P. 126(b).

- 15 -

the Rules of Appellate Procedure]," *see* Pa.R.A.P. 1701(b)(2); *see also* *Morgan v. Morgan*, 117 A.3d 757, 759 & n.6 (Pa. Super. 2015) (noting that when a father and mother cross-appealed a support order, the trial court retained authority to enforce the order because the father did not seek a supersedeas or a stay of the order under appeal). As this Court has stated, "The law is clear that an order validly issued by a court must be obeyed until declared invalid in the regular course . . .." *Ewing v. Oliver Realty, Inc.*, 451 A.2d 751, 755 (Pa. Super. 1982).

Neither Attorney Ducote nor Mother assert they obtained supersedeas or stays pending the appeals of the November 2023 gag order or any other pretrial order on which they were found in contempt on June 13, 2024. Therefore, Rule 1701(a) did not automatically divest the trial court of jurisdiction to enforce its orders. *See* Pa.R.A.P. 1701(b)(2); *Morgan*, 117 A.3d at 759 & n.6. Moreover, and as will be discussed further below, we discern no merit to Attorney Ducote's and Mother's contention that the June 13, 2024 order found them in contempt on the same bases as the contempt orders addressed in *N.E.G. I*. Although there is a significant overlap between the matters discussed in the prior contempt orders and the instant June 13, 2024 order, a close reading of the procedural history and the record in the case establish the conduct at issue in the present appeal involved *separate* violations of standing pretrial orders. Thus, we reject any overarching claims that the appeals in *N.E.G. I* divested the trial court of jurisdiction to proceed

- 16 -

against Attorney Ducote and Mother, ***see Morgan***, 117 A.3d at 759 & n.6, or operated, as a matter of double jeopardy, to bar the additional adjudications of contempt against Attorney Ducote. ***See In re Martorano***, 346 A.2d 22, 31 (Pa. 1975) (noting that even if double jeopardy applied to civil contempt, no double jeopardy issue would arise from separate adjudications of civil contempt when a witness before a grand jury refused to answer a similar question on two separate days).

## II. Contempt Issues

Attorney Ducote and Mother next contend the trial court abused its discretion when finding them in contempt. We address Attorney Ducote's and Mother's arguments together while reviewing the eight areas of contempt discussed by the trial court; however, before doing so, we set forth our standard of review and consider their arguments that adjudication was for criminal, rather than civil, contempt.

### Standard of Review: Criminal versus Civil Contempt

"Our standard of review over findings of contempt in the trial court is extremely narrow. This Court will reverse only upon a showing of an abuse of discretion." ***Fetzer v. Fetzer***, 336 A.3d 1058, 1064 (Pa. Super. 2025) (internal citations and quotation marks omitted).

As our Supreme Court has noted:

Contempt proceedings may be criminal or civil in nature. This distinction is extremely important because it determines the due process rights of the alleged contemnor. It is . . . difficult to

distinguish between civil and indirect criminal contempt. There is no bright line distinction between the two varieties of contempt, because civil and criminal contempt share common attributes (which plagues litigants, counsel and the courts). . . . However, the decisions of our Supreme Court agree that the fundamental and controlling difference between civil and criminal contempt proceedings is the **dominant purpose** of the sanctions that are to be imposed . . ..

**Cnty. of Fulton v. Sec'y of Commonwealth**, 292 A.3d 974, 1027-28 (Pa. 2023) (internal citations, quotation marks, brackets, and footnote omitted). Our Supreme Court has explained that the purpose of distinguishing the civil and criminal contempt "is simply to say that criminal[-]type sentences should not be meted out where criminal[-]type protections are not afforded, and that coercive sentences should not be meted out where there is nothing to coerce." **In re Martorano**, 346 A.2d at 29 n.17 (quoting D. Dobbs, Handbook on the Law of Remedies § 2.9, at 97 (1973)). A purge condition is a key element distinguishing civil from criminal contempt when the contemnor is imprisoned or sanctioned with the threat of imprisonment. **See Fetzer**, 336 A.3d at 1066; **Gunther v. Bolus**, 853 A.2d 1014, 1018 (Pa. Super. 2004).

The elements of civil and criminal contempt are similar and require proof that: "(1) the court's order was definite, clear, and specific to the contemnor as to leave no doubt of the conduct prohibited; (2) the contemnor had notice of the order; (3) the act constituting the violation was volitional; and (4) the contemnor acted with wrongful intent." **Fetzer**, 336 A.3d at 1068 (internal citation omitted) (discussing criminal contempt); **see also Gunther**, 853 A.2d at 1017 (stating, "For a person to be found in civil contempt, the moving party

must prove that: (1) the contemnor had notice of the specific order or decree that he disobeyed; (2) the act constituting the violation was volitional; and (3) the contemnor acted with wrongful intent;" and noting, "The order alleged to have been violated 'must be definite, clear, and specific—leaving no doubt or uncertainty in the mind of the contemnor of the prohibited conduct' and is to be strictly construed"). Criminal contempt requires proof beyond a reasonable doubt, while civil contempt requires proof by a preponderance of the evidence. *See Cnty. of Fulton*, 292 A.3d at 1004; *Fetzer*, 336 A.3d at 1068.[15]

Attorney Ducote and Mother contend that the contempt proceedings were criminal in nature because the trial court was punishing their past conduct and did not set purge conditions. *See* Attorney Ducote's Br. at 20; Mother's Am. Br. at 19-20. The trial court concluded that the contempt proceedings were civil in nature because they were primarily intended to coerce Mother and her counsel into compliance with its order and compensate Father for the losses sustained due to Mother's conduct. *See* Trial Ct. Mem., Seq. No. 1026, 6/13/24, at 35.

Following our review, we conclude the dominant purpose of the intended sanctions, here, counsel fees, was compensatory and coercive, not punitive. *See Cnty. of Fulton*, 292 A.3d at 1004; Trial Ct. Mem., Seq. No. 1026,

---

[15] Neither Attorney Ducote nor Mother develop an argument concerning the procedural requirements concerning civil versus criminal contempt beyond the applicable burdens of proof.

6/13/24, at 37. The fact that the trial court did not set a purge condition does not alter our analysis. **See Cnty. of Fulton**, 292 A.3d at 1004 (adopting a master's recommendation to impose counsel fees for a county's violation of a temporary stay and proceedings to enforce the stay without mention of a purge condition). Moreover, while it is clear that the trial court expressed understandable frustration over Mother and her counsel's litigation tactics, so long as the counsel fees are not excessive as to constitute punishment, we will regard the contempt proceedings to be civil, not criminal in nature. **See Sutch v. Roxborough Mem'l Hosp.**, 142 A.3d 38, 69 (Pa. Super. 2016).

A. Specific Areas of Contempt[16]

### 1. "Mother's Willful And Intentional Refusal And Failure To Comply With Mental Health Evaluation Orders"

In March 2023, the trial court issued an order for Mother and Father to submit to mental health examinations by Gerald Bellettirie, Ph.D. ("Dr. Bellettirie"), to cooperate fully with setting up the appointment; the court cautioned that the failure to comply with the order would result in contempt and sanctions. **See** Order, Seq. No. 364, 3/3/23. The order further permitted Dr. Bellettirie to inform the trial court if a party failed to cooperate or pay for the appointment. **Id**.

---

[16] In a desire for consistency and clarity, we quote the trial court's headings for the eight specific areas of contempt. **See** Trial Ct. Mem., Seq. No. 1026, 6/13/24, at 16-28.

Following the quashal of Mother's appeal of that order, the trial court entered a new order requiring Mother to schedule an appointment with Dr. Bellettirie. *See* Order, Seq. No. 537, 7/28/23. Mother received an "informed consent contract" from Dr. Bellettirie, but she crossed off one of the terms, signed the contract, then returned it. *See* Ex. M-13. Dr. Bellettirie responded to Mother that he would not be able to perform the evaluation because she did not agree to the contract. *See* Ex. M-14. Attorney Ducote then apparently emailed the trial court, advising, "This is to inform the [c]ourt that Dr. Bellettirie has now ***unilaterally*** cancelled [Mother's] evaluation and has opted out of participation." Order, Seq. No. 575, 8/29/23 (emphasis added).

In an August 29, 2023 order, the trial court stated Mother was in contempt and attached correspondence to the court from Dr. Bellettirie discussing Mother's refusal to accept a term of his informed consent contract. *Id*. The order offered Mother an opportunity to avoid a finding of contempt: she could schedule an appointment with Heather Green, Ph.D. ("Dr. Green"), fully comply and cooperate with Dr. Green, and complete "all forms provided to her by [Dr. Green] **with no revisions to the forms** by her and/or her counsel . . ..]" *Id*. (formatting in original). Throughout September 2023, Mother crossed off a term of Dr. Green's agreement for services on at least two occasions, *see* Exs. M-15 & M-16, and later, when discussing with Dr. Green the need to submit an ***unrevised*** agreement, mentioned to Dr. Green that their children played squash together. *See* Am. Order, Seq. No. 626,

10/6/23, at Ex. A; **see also** Ex. M-17. Dr. Green then corresponded with the trial court and stated, in relevant part, Mother attempted to revise the agreement of service and Dr. Green felt it would be inappropriate to conduct the evaluation based on Mother's claims of knowing her. Am. Order, Seq. No. 626, 10/6/23, at Ex. A. Dr. Green noted the "strange way" Mother suggested knowing her and her children and described it as "odd, if not somewhat alarming." **Id**.[17]

At the contempt hearings, Father and Mother presented evidence on Mother's failure to undergo the court-ordered mental health evaluation, which the parties had agreed on. Mother testified that she had complied with the trial court's order for a mental health evaluation; she explained that the term she crossed off was unnecessary to complete a mental health evaluation and that Attorney Ducote told her the term was "illegal." N.T., 1/9/24, at 226-27.[18] Mother insisted that crossing out the term did not prove her lack of

_____

[17] In October 2023, the trial court precluded Mother from presenting evidence regarding her, or Father's, mental health. **See** Am. Order, Seq. No. 626, 10/6/23.

[18] At the contempt hearings, Attorney Ducote characterized the term crossed out by Mother as "unconscionable." N.T., Seq. No 1004, 2/16/24, at 197. Mother's exhibits at the contempt hearings indicated that Mother crossed out cost-shifting provisions from Drs. Bellettirie's and Green's forms. **See** Exs. M-13 & M-15. Those provisions, stated, for example:

> I [Mother] agree that if I at any time file a lawsuit, or a license or ethics complaint, or take any other legal action against [the doctor, his employees or his practice concerning any aspect of [the

*(Footnote Continued Next Page)*

cooperation with the mental health evaluation. *See id*. at 227. Mother emphasized that she knew Dr. Green and her family, and Father stipulated that Children and Dr. Green's children played squash on the same team.

In its June 13, 2024 memorandum, the trial court found Mother in contempt and explained that: it entered the initial order for Dr. Bellettirie to conduct mental health evaluations in March 2023, as part of an agreed order; Attorney Ducote's email that Dr. Bellettirie unilaterally canceled the evaluation was "misleading and deceptive" because Mother had crossed off a term in the agreement for service; and, despite being offered a second chance to undergo an evaluation with Dr. Green, Mother continued to cross out boilerplate language and terms from the agreements for service. *See* Trial Ct. Mem., Seq. No. 1026, 6/13/24, at 16-19. The trial court emphasized Dr. Bellettirie's comment that no client had struck language in his contract in his forty years of practice, and Dr. Green's comment that she found the manner in which Mother raised their connection through their children "odd" and "alarming." *Id*. at 18. This, the trial court concluded, evidenced Mother's "willful, intentional and obstructionist" violations of the court's orders, which Mother

_____

doctor's] service for my family, and there is then a ruling or determination favorable to [the doctor], or the parties voluntarily dismiss or withdrawal [sic] the complaint, the parties agree to reimburse [the doctor] for all of the legal, professional, office and court costs incurred in connection with this claim.

*See generally* Ex. M-15.

could not explain away by maintaining that the terms were illegal and she had in fact complied with the court's orders. *See id*. at 17-18.

On appeal, Mother initially asserts that she never agreed to a mental health evaluation and suggests the trial court should have colloquied her regarding her consent to the agreement to the order for an evaluation. *See* Mother's Am. Br. at 22. She contends that the trial court improperly relied on *ex parte* investigations and communications with Dr. Bellettirie when finding her in contempt. *See id*. at 23. She also claims there was no evidence supporting the trial court's finding that she struck "boilerplate" language in either Dr. Bellettirie's or Dr. Green's terms and conditions, and the court defamed her by selectively quoting Dr. Green's statements that it was "odd and alarming" when Mother mentioned their children knowing each other. *Id*. at 23-24. Mother asserts the trial court also improperly shifted the burden of proof to her to explain why Drs. Bellettirie or Green declined to evaluate her and abused its discretion by ignoring evidence that neither Dr. Bellettirie nor Dr. Green felt it appropriate to evaluate Mother. *See id*.

Following our review, we find the majority of Mother's arguments misplaced. Mother did not object to the entry of the March 2023 agreed order, and she cites no authority requiring the trial court to colloquy a represented party prior to issuing such an order. The trial court, as the finder of fact, was entitled to discredit Mother's assertion she had a legitimate reason to cross off a term from Dr. Bellettirie's form. Moreover, Mother's challenges to the

sufficiency of the evidence ring hollow when the order allowing her the opportunity to undergo an evaluation by Dr. Green left no doubt that crossing off the term in the agreement would constitute contempt. To the extent Mother later attempted to justify her failure to undergo the evaluation because she was familiar with Dr. Green, such rationalizations do not excuse her non-compliance with the trial court's orders throughout September 2023, particularly when Mother made no effort to alert the court to the connection between Mother and Dr. Green before Dr. Green felt compelled not to evaluate Mother. Accordingly, Mother's arguments merit no relief.

2. *"Mother's Willful And Intentional Refusal And Failure To Comply With Court Orders Regarding Submission Of Photographs"*

As noted above, the photographs, which Mother alleged constituted sexual abuse images, became the centerpiece of Mother's claims in PFA and custody proceedings. By way of further background, Mother asserted that she downloaded the contents of Father's cloud storage in 2018, and slowly began discovering sexually inappropriate photographs and videos of Children, which she then showed to child welfare offices and law enforcement agencies. None of those investigations resulted in a determination of founded abuse or criminal charges. Mother also used the photographs in PFA proceedings in 2023, but no court issued a final PFA order in her favor.

In the custody proceedings, Mother filed a motion for an *in camera* review of the photographs. **See** Mot., Seq. No. 416, 5/5/23. The trial court granted that motion in the June 26, 2023 order but, as noted above, imposed

- 25 -

a series of conditions and restrictions to authenticate and verify when and where Father took the photographs, whether Mother had provided the photographs to a child welfare office or law enforcement agency, and the findings those bodies provided. Order, Seq. No. 476, 6/26/23. The order also stated that Mother should not submit photographs previously submitted in an unsuccessful PFA proceedings and/or where a law enforcement or child welfare agency found the photographs not to be sexually inappropriate. The order directed compliance with the conditions by July 7, 2023, for consideration at the July 17, 2023 emergency hearing. While Mother attempted to submit the photographs, she did so without complying with the trial court's conditions.

The trial court then issued an order for Mother to comply with the June 26, 2023 order, and attached a verification form it intended Mother and Attorney Ducote to complete. *See* Order, Seq. No. 544, 8/4/23, 8/4/23. Mother submitted an altered verification that changed the verification language of the court's form and added the following preface:

> These photographs were provided to the [trial c]ourt to be reviewed *in camera* pursuant to the terms of [the June 26, 2023 order], to the extent that the legally unsupportable conditions *sua sponte* imposed by the [c]ourt, which attempted to circumvent and nullify the only applicable criteria for the admission of the photographs found in Rules 401-402 & 901-902, Pa. Rules of Evidence, were capable of compliance. By submitting this statement, I in no way waive any pending appeals or other motions, including my pending King's Bench Application in The Pennsylvania Supreme Court (No. 83-MM-2023), and maintain that Judge Wall is intractably biased and prejudiced against me to the extent that she must be recused. Furthermore, as a matter of law and judicial discretion, whether or not the photos and images at issue were submitted to, considered by, or otherwise

- 26 -

involved in any way with any of the agencies listed . . . below is completely irrelevant to their admissibility in this proceeding. Given that [Father] and his counsel have asserted that I was the one who took and/or condoned their capture, and that there is nothing inappropriate in the photos, the fact that the [c]ourt continues to impose various obstacles and traps to avoid their consideration by the [c]ourt, with the [c]ourt's hope that I and my counsel can be snared into the [c]ourt's *a priori* predetermined bogus contempt adjudications, can only be viewed as the court's preemptive protection of [Father's] interests as the *de facto* co-counsel with [Father's] attorney, whom the [c]ourt casually calls "Norm" in open court as my and my counsel's demise was planned at the July 17, 2023, hearing. If, in fact, I took or condoned the pictures, or if they were innocent parental photos, [Father] would have eagerly offered the photos into evidence long ago.

Verified Statement, Seq. No. 550, 8/10/23. On August 14, 2023, the trial court issued an order precluding the submission of the photographs. *See* Order, Seq. No. 552, 8/14/23.

In the present contempt proceedings, the trial court found Mother violated the August 14, 2023, preclusion order by giving copies of the photographs to the guardians *ad litem* appointed in the present custody matter, the Federal Bureau of Investigation, law enforcement in New York, New York's child protective services office, and an attorney in New York who filed a civil suit against Father. *See* Trial Ct. Mem., 6/13/24, at 21.

On appeal, Mother essentially asserts that the June 26, 2023 order imposed unlawful conditions for an *in camera* review, and the June 13, 2024 finding of contempt in this area reflected the court's biases and ill-will toward Mother and her counsel. She maintains that she acted to protect Children, not with wrongful intent. She also asserts she complied with the trial court's

verification when submitting the verified statement. **See** Mother's Am. Br. at 24-27.

Following our review, we conclude the majority of Mother's arguments, directed at the initial June 26, 2023, order for an *in camera* review, are unavailing because they fail to address the basis for the contempt finding. Moreover, as noted above, the law requires a party to obey an order validly issued by a court until it is declared invalid **in the regular course**. **See Ewing**, 451 A.2d at 755. To the extent Mother argues that she did not act with wrongful intent, or that the trial court found wrongful intent based on bias or ill-will, we conclude the trial court made factual and credibility determinations that were supported by the record. **See Gunther**, 853 A.2d at 1018. Lastly, the record amply refutes any suggestion of Mother's good faith attempt to verify the photographs for an *in camera* review, which included a wholly inappropriate invective against the trial court. That action alone could have justified striking the statement and imposing sanctions, even without Mother's alteration of the substance of the verification requirement imposed by the court. **See** Verified Statement, Seq. No. 550, 8/10/23. Thus, Mother's argument merits no relief.

### 3. *"Mother And Her Counsel's Violation Of Custody Orders By Communicating With Children Regarding Custody Matters"*

In June 2023, the trial court issued an order, which, in relevant part, set forth a no-communications provision barring counsel and the parties from "discussing the content of any pleading or matter involving this custody

litigation with their three (3) minor children." Order, Seq. No. 474, 6/21/23. The trial court found that Mother and Attorney Ducote violated the June 2023, prohibition on communication when Attorney Ducote took the "sworn statements" of I.M. and J.M.M. and repeatedly tried to put the "sworn statements" into the record. Trial Ct. Mem., Seq. No. 1026, 6/13/24, at 22. The trial court also noted Mother and Attorney Ducote filed the Montgomery County civil lawsuit on behalf of I.M. based on the photographs. **See id**. at 22-23.

Attorney Ducote and Mother both assail the trial court findings as unsupported by the record because the trial court struck the "sworn statements," and Father presented no evidence when Attorney Ducote and Mother filed the Montgomery County civil lawsuit. **See** Attorney Ducote's Br. at 22-23; Mother's Am. Br. at 28. They emphasize that the record suggests Attorney Ducote took the "sworn statements" **before** the trial court's June 2023, order prohibiting them from communicating with Children. **See** Attorney Ducote's Br. at 22 n.6 (suggesting that Attorney Ducote took the "sworn statements" in May 2023); Mother's Am. Br. at 28 (same). Mother also contends that the June 2023 order was insufficiently clear as to preclude the filing of a civil lawsuit and that the record was incomplete because Children did not testify at the contempt hearings. **See** Mother's Am. Br. at 29-30.

We agree that the record establishes that Mother and Attorney Ducote took the "sworn statements" some time in or before May 2023, as the "sworn

statements" were first referred to in an emergency petition that same month. *See* Emergency Pet., Seq. No. 432, 5/17/23. That fact precludes "sworn statements" serving as the sole basis for contempt for violating the no-communications provision of the June 2023 order. *See Stahl v. Redcay*, 897 A.2d 478, 493 (Pa. Super. 2006).

Nevertheless, Mother ultimately conceded that Attorney Ducote filed the Montgomery County civil lawsuit in July 2023. N.T., Seq. No. 963, 2/28/24, at 219-21. It is clear from the record that that lawsuit, filed by Attorney Ducote for Mother on I.M.'s behalf, raised the same claims at issue in the custody matter, namely, the photographs, and the suit continued until at least December 2023. *See* Answer, Seq. No. 681, 11/13/23. Therefore, the record supported a reasonable inference that Mother, as the nominal plaintiff in the Montgomery County civil lawsuit, was communicating with I.M. about custody matters *after* the June 2023 order prohibiting communication with Children, and we reject Mother's claims to the contrary.[19]

As to Attorney Ducote, we note that the trial court previously found him in contempt for violating the no-communication provision in the January 11, 2024 order, which involved sanctions for conduct that continued until September 2023. In the instant case, there was ample evidence that Attorney

_____

[19] Although not discussed by the trial court on this specific finding of contempt, we note Mother's lawsuit in New York, filed on behalf of Children in November 2023, further evidenced ongoing communications with Children about the custody matter. Indeed, the complaint in the New York lawsuit contained specific grievances against the Pennsylvania Court. *See* Ex. F-20.

Ducote, who maintained I.M. was his client in the Montgomery County civil lawsuit, continued to speak with I.M. about custody matters. For example, when Attorney Ducote opposed Father's motions for his disqualification in November 2023, he attempted to attach (despite orders about improper filings) a letter from I.M. in support of his contention that Mother's and I.M.'s interests were aligned. **See** Answer, Seq. No. 681, 11/13/23; Mem. of Law, Seq. No. 714, 11/20/23; **see also** Order, Seq. No. 742, 11/29/23 (striking the attachment). Thus, there was sufficient evidence of Attorney Ducote's continued communication with I.M. about custody matters, in particular the allegations of invasion of privacy and sexual exploitation involved in the Montgomery County civil lawsuit. Neither Attorney Ducote's nor Mother's arguments merit relief.

4. *"Mother And Her Counsel's Violation of [November 2023] Gag Order"*

As detailed in **N.E.G. I**, the trial court entered a gag order in November 2023, which a panel of this Court affirmed; the trial court also issued a December 1, 2023, order finding Attorney Ducote and Mother in contempt for violating the November 2023 gag order. **See N.E.G. I**, 2025 WL 1879568, at *12-17. The panel vacated the December 1, 2023, contempt order based on a lack of notice of an adjudication of contempt for a violation of the gag order and an insufficient opportunity to be heard. **See id**. at *17-18. The trial court, in its June 13, 2024 order, again found Mother and Attorney Ducote violated the November 2023 gag order, but recited facts and conclusions

similar to those reached when finding Attorney Ducote in contempt on December 1, 2023. *See* Trial Ct. Mem., Seq. No. 1026, 6/13/24, at 22-23. The trial court, without citation, indicated the violation of the November 29, 2023 gag order was continuing at the time it issued the instant June 13, 2024 contempt order. *See id*. at 23 n.34.

In the present appeal from the June 13, 2024 order, Attorney Ducote and Mother argue the trial court's explanation for finding them in contempt was "troubling" and "disjointed." Attorney Ducote's Br. at 24; Mother's Am. Br. at 30-31. They both assert no record evidence supported the trial court's findings. *See* Attorney Ducote's Br. at 24; Mother's Am. Brief at 30-31.

At the outset, we reiterate that this Court previously vacated the December 1, 2023 adjudication of contempt based on a lack of notice and opportunity to be heard. *See N.E.G. I*, 2025 WL 1879568, at *18. As the panel explained:

> When a trial court adjudges someone in contempt of a custody order, five procedural elements are recommended to ensure due process: (1) a rule to show cause why attachment should issue; (2) an answer and hearing; (3) a rule absolute; (4) a hearing on the contempt citation; and (5) an adjudication. However, all five factors are not mandatory. The essential due process requisites for a finding of civil contempt are notice and an opportunity to be heard.
>
> Instantly, the trial court *sua sponte* found Mother and Attorney Ducote in contempt of the November 29, 2023 gag order (#740). The court did not provide a rule to show cause, did not permit Mother and Attorney Ducote to answer, did not issue a rule absolute, and did not hold a hearing on the contempt citation. *See id*. Although the parties clearly had notice of the requirements set forth in the gag order, they did not have notice

of the contempt citation, and did not have any opportunity to be heard prior to the court's adjudication.

*Id*. (internal citations, quotation marks, and indentations omitted).

In the present case, a review of the record reveals no indication that Father or the trial court provided adequate notice for a ***subsequent*** adjudication of contempt for a violation of the November 2023 gag order between the now-vacated December 1, 2023 adjudication of contempt and March 2024, when the contempt hearings ended. Moreover, the trial court did not discuss any additional evidence of a separate violation that occurred after its December 1, 2023 contempt order.[20] In light of ***N.E.G. I***, it would be anomalous to affirm the trial court's findings in this appeal where we have already concluded those findings were tainted by the lack of notice and opportunity to respond. Accordingly, we are constrained to vacate this aspect of the trial court's June 13, 2024 findings of contempt.

_____

[20] We note that Father had complained that Mother and Attorney Ducote had a letter by I.M. posted on a third-party's social media account in November 2023. ***See*** Pet., Seq. No. 738, 11/29/23. At the January 9, 2024 hearing, the trial court asked Mother to use her phone to access the third-party's social media page. ***See*** N.T., Seq. No. 1015, 1/9/24, at 6-13. Although Attorney Ducote objected, he eventually conceded there was a copy of I.M.'s letter on the page, and the trial court, reading from Mother's phone, stated the posting included reference to the court, Father's name, and other initials, which corresponded to Children. ***See id***. at 17-18. However, the trial court did not discuss this incident as a basis for finding Attorney Ducote and Mother in contempt.

*5. "Mother[']s . . . Interference With Son's Counseling"*

In March 2023, the trial court entered an order appointing Marla Isaacs, Ph.D. ("Dr. Isaacs") as the therapist for the parties' son, J.M., and directed that "[n]o gratuitous oral communications or written materials are to be submitted by either party." Order, Seq. No 368, 3/13/23. Father's and Mother's counsel each sent emails to Dr. Isaacs to which the other party apparently objected. Father filed contempt petitions based on the following email sent by Attorney Rizzo to Dr. Isaacs:

> Dr. Isaacs,
>
> I object to [Father's counsel] attempting to prejudice [J.M.'s] therapy and your therapeutic relationship with [J.M.] with his emails.
>
> [Father's counsel's] framing of therapy for [J.M.] in terms of litigation outcomes of [Father's] ongoing and continuing physical, emotional, and now legal abuse has nothing to do with what's best for [J.M.].
>
> It is established by scholarly research in psychology, social science, law, and survivor advocacy[,] that violent men like [Father] simply continue and move their violence into family court by legal abuse once separated from their spouses.
>
> [Mother] has only initiated court pleadings to advocate for [C]hildren's best interests, safety, and welfare.
>
> The facts of this case remain that [Father] is a violent man and there is a long-standing objective pattern of facts that point to the disturbing pattern of [Father's] violence against . . . [M]other and [C]hildren.
>
> The facts demonstrate that [Father] has exposed the three children to unrelenting ongoing violence which remains one of the most severe adversities of childhood as recognized by the American Academy of Pediatrics.

There are more than 15 years of objective facts, which may be provided to you for your review to prove this.

[Listing medical reports and other alleged evidence of physical abuse]

. . .

Ex. F-17.

Father's counsel's theory of contempt against Attorney Rizzo and Mother was that they were attempting to prejudice Dr. Isaacs by reciting allegations of physical abuse that did not give rise to criminal charges and for which courts had denied final PFA orders. In short, Father asserted the allegations were "false and defamatory," which, in addition to Mother's failure to pay Dr. Isaacs, caused Dr. Isaacs to resign from the case. *See* Pet., Seq. No. 606, 9/22/23. The trial court agreed and found Mother in contempt because she and Attorney Rizzo admitted that Attorney Rizzo sent the email making "untrue and inflammatory accusation about Father," and because Mother admitted she "knew about this, but miserably failed at any attempt to justify the communication." Trial Ct. Mem., Seq. No. 1026, 6/13/24, at 24.

Mother contends the trial court abused its discretion by shifting the burden of proof to her to justify Attorney Rizzo's email when Attorney Rizzo sent the email, and where Mother testified that she only saw the email "after the fact." Mother's Am. Br. at 31-32.

Following our review, we discern no abuse of discretion in the trial court's conclusion that Mother was responsible for Attorney Rizzo's email. Mother's testimony indicates that she was intimately aware of the

circumstances surrounding Attorney Rizzo's email to Dr. Isaacs. As Mother testified:

> It's my understanding that [Attorney Rizzo] responded to something that [Father's counsel] wrote. I was left out of that. It was an e-mail – if you may indulge me for a second. It was an e-mail initiated by the therapist to both counsel requesting, I believe, demographic information. And, . . . I recall that [Father's counsel] sent over several things in that that were not requested, because they were not . . . name, . . . date of birth[, or] . . . school.
>
> And then I believe because the therapist reached out to [Father's counsel] and [Attorney Rizzo], that [Attorney Rizzo] then replied to that e-mail. I think I saw it after the fact. I wasn't even included, I believe, on that e-mail. It was an e-mail to counsel.

N.T., Seq. No. 1015, 1/9/24, at 230-31. Mother's own knowledge of the circumstances surrounding the email—which re-raised the same claims of physical abuse she had raised in prior unsuccessful PFA proceedings and motions and "notices" in the custody matter—provides a sufficient basis to infer Mother authorized Attorney Rizzo's email. Thus, we discern no merit to Mother's claim that the trial court improperly shifted the burden of proof by failing to justify the communication.

### 6. *"Mother's Willful And Intentional Failure To Consult And Keep Father Apprised Of Children's Activities, Events, Medical And Dental Appointments"*

Throughout the custody proceedings, Mother and Father, when they shared custody, operated under standard requirements that "each parent shall inform and keep the other parent fully informed of all educational, medical, social and religious matters concerning the children, and obtain consent from

the other parent (except on an emergent basis) for all care and activities involving the children." ***See generally*** Order, 3/3/23, Seq. 362. Father filed multiple petitions for contempt asserting Mother violated his right to shared legal custody and failed to consult or provide updates for Children.

On appeal, Mother's sparse arguments, without proper citation to the transcripts, fundamentally misstate the procedural history of the contempt proceedings. ***See*** Mother's Am. Br. at 32-33. Mother, moreover, ignores the trial court's broader conclusions that she misused PFA and other legal processes to interfere with Father's custody throughout the history of the case. Under these circumstances, we conclude Mother has not adequately formulated her argument, and we will not address a waived claim. ***See Butler v. Illes,*** 747 A.2d 943, 944 (Pa. Super. 2000) (stating, "[w]hen issues are not properly raised and developed in briefs, when briefs are wholly inadequate to present specific issues for review, [this] court will not consider the merits thereof").

*7. "Improper Filings On The Court Docket By Mother And Her Counsel"*

In May 2023, Mother, through her counsel, began submitting documents under the title "notices" or "submissions", or as attachments to otherwise proper filings such as pretrial statements or memorandums of law. These documents included partial records from previous PFA proceedings (apparently to show that a court initially granted one of Mother's attempts at a final PFA order before that order was vacated), the extrajudicial "sworn

statements" taken from I.M. and J.M.M. by Attorney Ducote, Mother's expert reports[21] suggesting the photographs were sexual abuse images. **See** Obj., Seq. No. 469, 6/16/23. In June 2023, the trial court entered the first of its orders striking one of several of these filings, or portions thereof, as "mere attempts by [Mother] and her counsel to enter documents on the record that incorporate self-serving allegations in a form not permitted by the rules of civil procedure." Order, Seq. No. 457, 6/8/23; **see also** Order, Seq. No. 533, 7/21/23; Order, Seq. No. 543, 8/3/23 (alluding to the filing of a sealed envelope of photographs without the required verification). Mother and Attorney Ducote, however, persisted in this conduct until long after September 2023, when that conduct was the subject of a contempt finding against Attorney Ducote. **See** Order Seq. No. 742, 11/28/23 (striking an exhibit from a filing in November 2023, at 714); **cf**. **also** Order, Seq. No. 791, 12/13/23 (noting filings under "objections" was procedurally incorrect); Order, Seq. No. 797, 12/18/23.

On appeal, Attorney Ducote, in addition to disparaging the trial court, asserts that "there is absolutely no evidence to support beyond a reasonable doubt these spectral contempt findings . . . [which] must also be vacated and

---

[21] The "notices" or "submissions" also included the and curriculum vitae of those experts.

reversed." Attorney Ducote's Br. at 25-26.[22] Mother repeats that argument and adds the trial court's findings cannot be sustained because the documents were stricken and the stricken documents could have been admissible at a custody hearing. *See* Mother's Am. Br. at 34-36. Mother suggests that the trial court also found her in contempt for filings on a PFA docket, which would be beyond the scope of contempt in the custody proceedings.

Following our review, we find the record is self-sustaining and supports the trial court's finding of contempt. As discussed above, there were ample descriptions of the documents and filings to demonstrate persistent violations of court orders not to file such matters as part of the docket. *See* Order, Seq. No. 543, 8/3/23 (alluding to the filing of a sealed envelope of photographs without the required verification); Order Seq. No. 742, 11/28/23 (striking an exhibit from a filing in November 2023). To the extent Mother asserts the trial court acted improperly in striking potentially admissible evidence, she ignores the fact that she proffered such "evidence" outside the normal course of a hearing and by using the docket improperly. Mother's further claim that the trial court may have referred to one improper filing in a separate PFA case does not demonstrate reversible error or bias and ill-will. Accordingly, Attorney Ducote's and Mother's claims lack merit.

---

[22] We note with disapproval the condescending, and at times sarcastic, tone that permeates Attorney Ducote's and Mother's briefs. As an appellant, an individual is certainly entitled to argue the trial court erred. However, to use a brief addressed to this, or any, court to express disdain for the trial court that rules contrary to a party's position is unprofessional.

*8. Mother And Her Counsel's Frivolous And Vexatious Appeals And Admonishments From The Superior Court.*

In the last issue concerning the adjudication of contempt, Attorney Ducote and Mother assert that the trial court lacked jurisdiction to find them in contempt for filing frivolous appeals. Both cite a *per curiam* order of the Supreme Court in **S.B. v. S.S.**, 183 A.3d 344 (Pa. 2018) (*per curiam*), and Mother also cites **Thunberg v. Strause**, 682 A.2d 295 (Pa. 1996). In short, Attorney Ducote and Mother assert that the trial court had no authority to determine whether an appeal is frivolous and assess counsel fees on such a finding.

We agree in principle that jurisdiction to determine whether an appeal is frivolous rests with the court in which an appeal is taken. **See Lundy v. Manchel**, 865 A.2d 850, 857 (Pa. Super. 2004) ("[a]n appeal is 'frivolous' **if the appellate court** determines that the appeal lacks any basis in law or in fact") (emphasis added). As an extension, under Pa.R.A.P. 2744, only the appellate court has jurisdiction to direct an award of counsel fees for a friviolous appeal.

Following our review, we conclude the trial court erred in finding Mother in contempt for filing frivolous appeals. First, this matter should not have been considered as a matter of contempt, as there is no court order addressing appeals that Mother violated. Second, the trial court erred in awarding counsel fees based on all appeals taken by Mother in the custody proceedings as the authority to so do rests with this Court. **See** Pa.R.A.P. 2744; **Thunberg**

*v. Strause*, 682 A.2d at 302 (Pa. 1996); *S.B.*, 183 A.3d at 344. Indeed, we remanded for such an award in one of those appeals, *see* Order, 1995 EDA 2023, 8/24/23, and imposed other sanctions in other appeals. Therefore, we vacate this aspect of the June 13, 2024 contempt order to the extent it required Mother to pay counsel fees for appeals from May 2023 to March 2024, and Attorney Ducote based on counsel fees from September 2023 to March 2024.[23]

### III.   Sanctions

In their final arguments, Attorney Ducote and Mother assert the trial court erred in formulating its sanctions.

Attorney Ducote asserts that the trial court lacked the authority to award counsel fees for indirect criminal contempt. He adds that because he is not a party to the custody matter, he cannot be ordered to pay attorney's fees under 23 Pa.C.S.A. § 5323(g)(1). Since we have concluded that the sanctions were coercive and compensatory, rendering the contempt proceedings civil in nature, we discern no merit to this issue. *See Cnty. of Fulton*, 292 A.3d at 1004 (adopting a master's recommendation to impose counsel fees for a county's violation of a temporary stay and proceedings to enforce the stay without mention of a purge condition).

---

[23] Nothing in our decision here affects our prior decision to affirm, based on waiver, the January 11, 2024 contempt order that required Attorney Ducote to pay counsel fees for appeals from May 2023 to September 2023. *See N.E.G. I*, 2025 WL 1879568, at *22.

For her part, Mother briefly refers to the trial court's decision to incorporate a prior July 17, 2023 contempt to add $10,000 to the $100,000 award of counsel fees for all other contempt. However, a review of record makes clear that the July 17, 2023 contempt was a summary attachment for direct criminal contempt after Mother's repeated attempt to introduce the photographs at an emergency hearing. *See* N.T., Seq. No. 547, 7/17/23, at 245; Order, Seq. No. 533, 7/21/23. The trial court had advised at that time the contempt was subject to a $5,000 fine. Under these circumstances, we conclude it was inappropriate to convert that $5,000 fine to an award of $10,000 in counsel fees. Accordingly, we direct that the July 17, 2023 contempt should be assessed separately as a $5,000 fine against Mother in addition to the remaining $100,000 sanction assessed against Mother.

### Summary

In sum, we have concluded that the June 13, 2023 order was for civil contempt on which the trial court had jurisdiction to proceed despite the pending appeals in ***N.E.G. I***. We affirm the trial court's order with the exception of vacating the trial court's findings of contempt for violations of the November 2023 gag order, and the apparent finding of contempt for filing frivolous appeals. We also discern no basis for the award of $10,000 in counsel fees for Mother's July 17, 2023 contempt. While we discern no basis to conclude that vacating the violations of the November 2023 gag order would disturb the overall sanction of counsel fees imposed in this case, the vacatur

of the trial court's assessment of counsel fees for frivolous appeals and the July 17, 2023 contempt upsets the total sanction reflected in the June 13, 2024 order. Therefore, we will vacate the order for a recalculation of sanctions consistent with this decision.

Order affirmed in part and vacated in part. Case remanded for recalculations of counsel fees consistent with this decision.[24] Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/5/2026

_____

[24] We note there is no indication of a final custody order being entered in this case. While we remand this matter, the best interest of the remaining child in the custody matter must take precedence. Nothing in our decision condones any further obstreperous and dilatory conduct on the part of Mother and her counsel.